UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JASON HOLSAPPLE,

       Plaintiff,

v.

JOHN MILLER, COUNTY
OF BAY,

                                /

Case No. 13-11039
Honorable Thomas L. Ludington

**OPINION AND ORDER GRANTING IN PART, DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND DISMISSING DEFENDANT COUNTY OF BAY**

Jason Holsapple (Holsapple) used to work for the Bay County Sheriff's Office as a Sheriff's Deputy. He began his employment in July 2011. Holsapple Dep. 52, *attached as* Defs.' Mot. Ex. J, ECF No. 22. During the entirety of Holsapple's time at the Sheriff's Office, the Bay County Sheriff was John Miller. In March 2012, Holsapple's employment was terminated, and he filed a complaint alleging that his termination occurred because of his affiliation with the Sheriff's political opponent in violation of his First Amendment rights. Holsapple's complaint alleges violations of his rights by both Bay County and Sheriff Miller (the Defendants).

On October 4, 2013, the Defendants filed a motion for summary judgment. Based on what follows, the motion will be granted in part and denied in part.

**I**

**A**

Holsapple served in the Marine Corps from shortly after September 11, 2001, until his discharge in April 2005. After leaving the armed forces, Holsapple eventually graduated from the police academy in December 2010, and he then applied for, and attained, a position with the

Bay County Sheriff's Office. Bay County, along with the Sheriff, are parties to a Collective Bargaining Agreement (Agreement) with the Police Officers Labor Council, which governs the terms and conditions of Bay County Sheriff's deputies. In relevant part, the Agreement provides that all new Sheriff's deputies shall be placed on a "two hundred sixty (260) work days probationary period" at the time of hire. Agreement art. 9.1, art. 10, *attached as* Defs.' Mot. Ex. A. Non-probationary employees can only be discharged "for just cause." *Id*. at art. 7.5. However, any "probationary employee can be terminated for any reason or for no reason." *Id*. at art. 10.

Holsapple began his employment as a probationary officer in July 2011—just as contemplated by the Agreement. Accordingly, he could be terminated "for no reason" for almost nine full months—or until approximately April 2012. As indicated above, Holsapple was terminated in March 2012.

**B**

Holsapple became a part of the Sheriff's Office during a time of extensive political activity. Sheriff Miller was up for reelection that year, and one of his opponents was former Bay County Sheriff's Deputy Robert "Bobby" Lee (Lee). *See* Pl.'s Resp. Ex. 3. Sheriff Miller had not faced real opposition before: in 2004 he ran unopposed; in 2008 his only opposition was "a 22-year-old Wal-Mart employee." Pl.'s Resp. Ex. 2.

Due to Sheriff's Miller's contested candidacy, not surprisingly, many employees felt the Sheriff's Office became a politically charged environment. Sheriff's Deputy Eric Anthony testified that there was "pressure" to support Sheriff Miller during the election:

> Q:   Was there a particular pressure put on deputies during the election process?
>
> A:   The atmosphere.

> Q: Was there pressure to support Miller?
>
> A: Not verbally.
>
> Q: It was just felt?
>
> A: Yes.

Anthony Dep. 9, *attached as* Defs.' Mot. Ex. K. At his deposition, Sheriff's Deputy Dean Treichel similarly discussed the expectation that Sheriff's Office employees were to support Sheriff Miller's campaign:

> Q: This unwritten rule that you talk about that you should support the person who hired you, who told you about this rule?
>
> A: I don't, I don't know. It's just something that everybody talked, you know, several people talked about.
>
> Q: Would that be other deputies or would it be your superiors?
>
> A: Everybody.

Treichel Dep. 31–32, *attached as* Defs.' Mot. Ex. M. Sergeant John Babiarz went so far as to say that those who did not support Sheriff Miller suffered detrimental treatment:

> Q: Do you think employees that support the sheriff politically get that kind of special treatment?
>
> A: I think that has something to do with it.
>
> Q: Do you think employees that oppose the sheriff or supported Bobby Lee, they are treated less preferentially?
>
> A: Yes.

Babiarz Dep. 7, *attached as* Pl.'s Resp. Ex. 4.

Holsapple testified that he "felt pressured into supporting Sheriff Miller" when he worked at the Sheriff's Office. Holsapple Dep. 76. He testified that "it was made known to [him] that you support Sheriff Miler if you want to work [at the Sheriff's Office]." *Id.* at 77. He also "got

- 3 -

the message that if [he] had openly talked about Bob Lee or supported Bob Lee, that [he] would be retaliated against." *Id*. at 79–80. In fact, Holsapple indicated that one member of the Bay County Sheriff's Office—Lieutenant Troy Cunningham—told him that "[t]he sheriff is going to be the sheriff again, and he's going to remember who was and wasn't on his team." *Id*. at 79.

Nevertheless, Holsapple supported Lee. He testified that he was "an active supporter all the way along." *Id*. at 78. That Holsapple supported Lee as a candidate for Bay County Sheriff was known by at least some of the individuals that worked with him. Deputy Anthony testified that he knew Holsapple supported Lee, and that Holsapple wasn't shy about it:

> Q: Did you understand that Jason supported Lee?
>
> A: Yeah.
>
> Q: And he wasn't quiet about his support, was he?
>
> A: No.

Anthony Dep. 9. Indeed, Deputy Anthony testified that Holsapple "was the most outspoken supporter" of Bobby Lee that he was aware of. *Id*. at 10.

Holsapple testified that he told many of his co-workers that he supported Lee for Bay County Sheriff: "Deputy Prezzato and I talked about it; Deputy Treichel and I talked about it; Deputy Kloska and I talked about it; Deputy Anthony and I talked about it; Deputy Woody and I talked about it; I believe Deputy Rhule and I had talked about it." Holsapple Dep. 75. He also claims that he had conversations concerning his support for Lee with Lieutenant Cunningham, Lieutenant Ryan Lothian, and Sergeant Babiarz. *Id*. at 78, 80, 81. According to Holsapple, when he was confronted by Lieutenant Cunningham and asked "whose team" he was on, whether Sheriff Miller's or his opposition's, he responded that he "thought Lee had some good ideas." *Id*. at 78, 80. Holsapple testified that Lieutenant Lothian said "I hope Lee wins. There

will be some changes around here," and that he responded, "Yeah. I think he's got some good ideas." *Id*. at 80–81. Finally, when Holsapple discovered that Sergeant Babiarz was a "supporter of Bob's" just as he was, he confided in the Sergeant that he approved of Lee's proposed changes and that he "hope[d] Bob wins." *Id*. at 82.

### C

Things did not go well for Holsapple at the Sheriff's Office after that. On December 8, 2011, Holsapple sent a letter to Sheriff Miller requesting an opportunity "to participate in the Delta College Police Academy as a physical fitness instructor[,]" as a form of secondary employment. Pl.'s Resp. Ex. 7. Soon after, Holsapple was informed by Lieutenant Cunningham that his request was "denied." Holsapple Dep. 153. When Holsapple asked for a reason, Lieutenant Cunningham responded: "For a guy who was in the military, you sure don't know when to keep your mouth shut." *Id*.

Later Holsapple requested permission from Lieutenant Cunningham to carry a rifle in his squad car, knowing that there were "rifles available." *Id*. at 162–63. Lieutenant Cunningham denied the request. *Id*. at 163. Additionally, Lieutenant Cunningham asked Holsapple whether he wanted to stay on third shift or be moved to second shift. *Id*. at 155. Holsapple indicated that he wanted to stay on third shift because he "liked working on third shift." *Id*. On February 15, 2012, Holsapple received a letter from then-undersheriff Michael Janiskee transferring him to second shift and assigning him to "Bangor Township Patrol." Pl.'s Resp. Ex. 8. At that point, at least one other Sheriff's Office Deputy began referring to Holsapple as the "Bangor bitch," even in front of command officers, but no action was taken to put an end to the derogatory comments. *Id*. at 158–59.

**D**

During the second week of March 2012, Sheriff Miller began interviewing Deputies about whether they "had heard anything negative being said by anyone, you know, like particularly command staff." Treichel Dep. 8. In a written statement, Sheriff's Deputy Emily Prezzato indicated that she was called into the Sheriff's Office on March 8, 2012—the day before Holsapple's employment was terminated. Prezzato Statement 5, *attached as* Defs.' Mot. Ex. E. She wrote, "Sheriff Miller informed me that someone had made a complaint about one of the Deputies in our department bad mouthing other employees. I knew that he was talking about Holsapple." *Id*.

The next day, March 9, Holsapple was called before Sheriff Miller. He was given a letter indicating that his "employment at the Bay County Sheriff's Office" was terminated. Pl.'s Resp. Ex. 9. Sheriff Miller testified that the meeting lasted "a matter of minutes," that Holsapple was "given [the] letter and dismissed from service." Miller Dep. 26, 27, *attached as* Pl.'s Resp. Ex. 10. Sheriff Miller testified that Holsapple was not given any reason for his termination: "I presented [Holsapple] with the letter and that was about it." *Id*. at 27.

On December 17, 2012, Sheriff Miller signed an affidavit—under oath—explaining why he chose to terminate Holsapple's employment with the Sheriff's Office:

> Prior to my decision to discharge Jason Holsapple from his employment at the Bay County Sheriff's Office, I received verbal reports from Bay County deputies that Holsapple had been making disparaging and, in some cases, alarming comments about members of the Sheriff's Office, including command staff. I was also told Holsapple had mentioned climbing up on a building and shooting people.
>
> Based on my investigation, I decided to discharge Holsapple for his misconduct. There was no other reason for my decision.

Miller Aff. ¶¶ 3–4, *attached as* Defs.' Mot. Ex. N.  But this is not the story he told while under oath at his deposition three months earlier.  At that time, Sheriff Miller acknowledged that it was Deputy Prezzato who came to discuss Holsapple's condition with him, that "she was afraid that Mr. Holsapple may do something to injure some of the deputies here[,]" and that she indicated that Holsapple had said "that he didn't care about living anymore, should just go up on a building and start shooting people."  Miller Dep. 29–30.  During his deposition, however, Sheriff Miller testified that Deputy Prezzato made these statements "*after* [Holsapple] was terminated."  *Id.* at 30 (emphasis added).  In fact, Sheriff Miller emphasized that Deputy Prezzato did not approach him until "after Mr. Holsapple was out of the building."  *Id.* at 31.

Sheriff Miller's testimony is also contradicted by Deputy Prezzato's written statement concerning the events.  Sheriff Miller testified that he was approached by Deputy Prezzato:

> Q: You talked to Prezzato?
>
> A: Yes.
>
> Q: Why did you talk to Prezzato?
>
> A: She came to talk to me.
>
> Q: She came to talk to you.  And what did she tell you prompted her to come talk to you?
>
> A: She said she was afraid that Mr. Holsapple may do something to injure some of the deputies here.

*Id.* at 29–30.

But Deputy Prezzato wrote that "[o]n 3/8/12, I was called into the Sheriff Department by Sheriff Miller.  Sheriff Miller informed me that someone had made a complaint about one of the Deputies in our department bad mouthing other employees."  Prezzato Statement 5.  Deputy

Prezzato indicated that she had "3/8/12 off," and so would not have been in the Sheriff's Office had she not been called. *Id.* at 6.

**E**

On March 7, 2013, Holsapple filed a complaint against Bay County and Sheriff Miller. He alleges that because of his political affiliation—his support of Robert Lee's election—he was subjected to numerous adverse employment actions: he was prohibited from obtaining secondary employment at Delta College Police Academy, Pl.'s Compl. ¶ 12; his request to carry a rifle in his patrol vehicle was denied "even though there was an available rifle in the arms room[,]" *id.* ¶¶ 24, 25; he was forced to change shifts even though he did "not want to," *id.* ¶¶ 28–29; that he was referred to as the "Bangor bitch" without repercussion, *id.* ¶ 30; and finally, that his employment was terminated on March 9, 2012, *id.* ¶ 31. Indeed, the gravamen of Holsapple's complaint is that he "was a political supporter of Robert Lee in the upcoming primary election for Bay County Sheriff[,]" and that the Defendants retaliated against him "for his political affiliation by terminating his employment in violation of the First Amendment . . . ." *Id.* ¶¶ 40, 41. On October 4, 2013, the Defendants filed a motion for summary judgment.[1]

**II**

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty*

---

[1] The Defendants' motion also seems to request relief under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim: "Defendants move to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief may be granted." Defs.' Mot. 7. But Defendants have attached numerous exhibits to their motion that are not referenced in Holsapple's complaint (many deposition transcripts, for example), and thus their motion will be analyzed as one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

- 8 -

*Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III

Holsapple alleges one claim in his complaint for First Amendment retaliation based on political affiliation. *See* Pl.'s Compl. ¶¶ 63–91. The Defendants allege that Holsapple cannot establish the prima facie elements of First Amendment retaliation, Defs.' Mot. 10; that even if he can, Sheriff Miller had "legitimate reasons" for terminating his employment, *id*. at 13; and finally, regardless of all else, Holsapple has not established the prerequisites for subjecting Bay County to liability for Sheriff Miller's conduct, *id*. at 15. The Defendants are correct as to Bay County, but not Sheriff Miller. Their motion for summary judgment will be denied in part and granted in part.

### A

Holsapple alleges First Amendment violations pursuant to 42 U.S.C. § 1983, which makes liable "[e]very person who," acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." There is no dispute here that Sheriff Miller was a state actor for purposes of § 1983; the only question is whether he violated Holsapple's First Amendment rights.

First Amendment retaliation claims are analyzed under a burden-shifting framework. A plaintiff must first make a prima facie case of retaliation, which comprises the following elements:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Dye*, 702 F.3d at 294 (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Dye*, 702 F.3d at 294–95 (quoting *Eckerman*, 636 F.3d at 208). Importantly, unlike under the *McDonnell Douglas* burden-shifting framework, the burden "does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye*, 702 F.3d at 295.

**1**

The Defendants acknowledge the first two elements of Holsapple's claim: "Here, [Holsapple] alleges that he was engaged in constitutionally protected speech or conduct by his affiliation with Sheriff Candidate, Bob Lee[,] and that he was terminated by Sheriff Miller because of his affiliation." Defs.' Mot. 11. They concentrate their arguments, however, on the third element: "The issue before this Court is whether [Holsapple] has failed to create sufficient

evidence showing that he was discharged because of this affiliation. He has not done so nor can he do so." *Id*.

The Defendants are incorrect. First, their argument that Holsapple "has admitted that he did *not* openly support Lee while he was employed by the Sheriff's Office," *id*. at 12, and that as a result he cannot prove up an actionable claim, is without merit. Indeed, the Sixth Circuit has established that "retaliation based on *perceived political affiliation* is actionable under the political-affiliation retaliation doctrine." *Dye*, 702 F.3d at 300 (emphasis added). Accordingly, it does not matter whether Holsapple openly supported Lee in the Sheriff election or not, only that he was perceived to do so by Sheriff Miller.

And—aside from all of the other Sheriff's Office employees who knew that Holsapple supported Lee's campaign—there is compelling evidence that Sheriff Miller learned of Holsapple's affiliation the day before he terminated Holsapple's employment. On December 12, 2012, Deputy Prezzato signed an affidavit representing that she "was asked by the Sheriff to memorialize in writing the facts that [she] had given him during [the March 8, 2012] interview," and that "[t]o the best of [her] knowledge, the majority, if not all, of the facts contained in [her] statement were told by [her] to the Sheriff prior to Holsapple's termination on March 9, 2012." Prezzato Aff. ¶¶ 3, 4, *attached as* Defs.' Mot. Ex. I. Notably, one of those facts—that Deputy Prezzato told Sheriff Miller about—was that Holsapple had informed her "when Bob Lee wins the election, he is going to go up to Lt. Cunningham and tell him 'fuck you.' " Prezzato Statement 6. This statement, along with Deputy Prezzato's assertion that she told Sheriff Miller about it, is sufficient to frame a genuine issue of fact as to whether Sheriff Miller knew of Holsapple's political leanings the day before he was fired.

In *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008), the Sixth Circuit clarified that temporal proximity alone can, in certain circumstances, suffice to show a causal connection in a retaliation case: "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* at 525. Twenty-four hours is a close temporal connection. *See Dye*, 702 F.3d at 306 ("A lapse of two months . . . is sufficient to show a causal connection, and the district court erred in holding otherwise."). Holsapple has satisfied his prima facie case for First Amendment retaliation.

**2**

The Defendants argue that even if Holsapple can meet his prima facie burden, which he has, Sheriff Miller had legitimate reasons for terminating his probationary employment: Holsapple was terminated "only after the Sheriff received numerous complaints from [Holsapple's] co-workers for reasons such as his negative attitude and disparaging and insubordinate remarks concerning the workplace, fellow deputies, command officers, the Sheriff and Bay County citizens." Defs.' Mot. 13–14. However, the Defendants are entitled to summary judgment at this point only if "in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Dye*, 702 F.3d at 294–95. Based on the facts, viewed in Holsapple's favor, a verdict for the Defendants is far from certain.

First, in their motion the Defendants suggest that Sheriff Miller knew about Deputy Prezzato's statements concerning Holsapple potentially shooting people from a building with his rifle before Holsapple was terminated: "Perhaps, most strikingly, [Holsapple] told Deputy

Prezzato that he wanted to climb up to the top of a building and start shooting people with his rifle. *Deputy Prezzato informed the Sheriff of this statement during her interview with him prior to [Holsapple's] discharge*. Exh. E." Defs.' Mot. 6 (emphasis added). But this is how Deputy Prezzato described her interview with Sheriff Miller in her written statement, Defendants' Exhibit E:

> On 3/8/12, I was called into the Sheriff Department by Sheriff Miller. Sheriff Miller informed me that someone had made a complaint about one of the Deputies in our department bad mouthing other employees. I knew that he was talking about Holsapple. On many occasions I did hear Holsapple speak about other employees. Holsapple told me that he did not like Gatza because of his ignorant comment at roll call and because one day at the gym he attempted to say hi and Gatza only gave him a head nod. Holsapple also talked about Latocki and how Latocki did not have to wear a tie, and would get issued a rifle right away because of his friendship with Lt. Cunningham. Holsapple stated that Latocki and Patrick Woody were the kool aid drinkers on 3rd shift. Holsapple further talked to me about Dean Treichel, stating he was immature and needed to grow up. Holsapple told me that he thought I was a kool aid drinker and that I could not be trusted. I further recall Holsapple talking to me about Lt. Cunningham. Holsapple advised me that Lt. Cunningham made ignorant comments toward him. Holsapple further stated that he found out that Lt. Cunningham was talking to some troopers about him and the next day came up to him and told him how he thought he was doing a good job. Holsapple stated that he thought Lt. Cunningham could not be trusted and did not respect him. Holsapple told me that when Bob Lee wins the election, he is going to go up to Lt. Cunningham and tell him "fuck you."

Prezzato Statement 5–6. Not only did Deputy Prezzato omit reference to Holsapple's alleged comments when describing her March 8, 2012 interview—as the Defendants have asserted—she did not mention those alleged comments anywhere in her written statement. *See id.* at 1–7.

Instead, Deputy Prezzato signed an affidavit three months later in which she indicates that she *did* tell Sheriff Miller about Holsapple's threats before his employment was terminated: "Additionally, and what is not in my statement, I had informed the Sheriff during that interview that Mr. Holsapple had told me at one time that he wanted to climb up to the top of a building and start shooting at people with his rifle." Prezzato Aff. ¶ 5. But the Supreme Court has made

clear that a party cannot "contradict[] his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Systs. Corp.*, 526 U.S. 795, 806–07 (1999) (collecting cases). Although Deputy Prezzato's previous statement was not under oath, the Supreme Court's requirement for some explanation has been applied in cases involving "a written statement not under oath." *Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000) (citations omitted).

Deputy Prezzato does not offer any explanation for why her written statement, in which she memorialized the facts that she relayed to Sheriff Miller during her March 8, 2012 interview, did not include Holsapple's comments concerning firing on citizens from rooftops. And, while the alleged contradiction between the two statements may not be sufficient to disregard Deputy Prezzato's affidavit entirely, *see O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 593 (6th Cir. 2009), it certainly weighs against a finding by a reasonable juror that Sheriff Miller knew about the comment when he terminated Holsapple's employment.

The other proffered reasons for Holsapple's termination also do not compel a summary verdict in favor of the Defendants. Although they claim that Sheriff Miller "received numerous complaints from [Holsapple's] co-workers for reasons such as his negative attitude and disparaging and insubordinate remarks," Defs.' Mot. 13, many of Holsapple's peers testified differently, as did Holsapple himself.

Holsapple testified that he never made any negative comments about the sheriff's office because he "liked working at the sheriff's office[,]" it was "where [he] always wanted to work." Holsapple Dep. 74, 75. Deputy Anthony testified that Holsapple was a good cop who never did anything to warrant termination:

> Q: You worked with [Holsapple] for quite a period of time, right?
>
> A: Yes.
>
> Q: Probably the bulk of his employment here with the county, right?
>
> A: Most of it.
>
> Q: Right. And you never heard him make a negative comment, did you?
>
> A: Not—yea.
>
> Q: Anything out of the ordinary, like to the point where you felt compelled to take it to, say, the undersheriff?
>
> A: No.
>
> \* \* \* \* \*
>
> Q: [Holsapple] was a good officer, too?
>
> A: Yeah.
>
> Q: And you never saw him engage in any behavior that you thought would warrant termination?
>
> A: No, ma'am.

Anthony Dep. 9, 10. Sheriff's Deputy Jeremy Kloska said the same things:

> Q: Did you ever work on nights with [Holsapple]?
>
> A: Yes.
>
> Q: During the time you worked with him, did you formulate an opinion as to his performance?
>
> A: I always thought he was a good cop.
>
> Q: Did you ever witness him engage in any behavior that would warrant termination?
>
> A: No.

Kloska Dep. 5, *attached as* Defs.' Mot. Ex. L.  Sheriff's Deputy Patrick Woody also worked with Holsapple, and he never heard Holsapple criticize command officers, coworkers, or superiors.  Woody Dep. 10, 11, *attached as* Pl.'s Resp. Ex. 12.  In fact, Woody never saw Holsapple "do anything on the job that suggested he wasn't performing satisfactorily."  *Id*. at 12.  Because a reasonable jury could find for Holsapple on his First Amendment retaliation claim, summary judgment is not warranted, as least as it pertains to Sheriff Miller.[2]

**B**

The Defendants also allege that Holsapple's claims against Bay County are inappropriate because he has alleged no facts that demonstrate an official Bay County policy, custom, or practice caused the violation of his First Amendment rights.  Defs.' Mot. 15; *see also Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 701 (1978).

In his response, Holsapple agrees that Bay County cannot be held liable for Sheriff Miller's conduct, but that it can be liable "for its joint employees within a sheriff's department, i.e. the sheriff's deputies."  Pl.'s Resp. 24.  But Holsapple has made no allegations against any Bay County Sheriff's Office employee other than Sheriff Miller.  And, as he admits, the Michigan Constitution provides, "The county shall never be responsible for [the sheriff's] acts . . . ."  Mich. Const. art. 7, § 6; *see also* Pl.'s Resp. 23–24.  Bay County will be dismissed.

**C**

One additional matter: Holsapple sought leave from the Court to file a supplemental brief in support of his opposition to the Defendants' motion for summary judgment.  *See* Pl.'s Mot.,

---

[2] Although the Defendants pled the affirmative defense of governmental immunity in their answer to Holsapple's complaint, *see* Defs.' Answer 12–13, ECF No. 8, the defense need not be addressed here because the defendants did not raise the affirmative defense of qualified immunity in their motion for summary judgment. *See Brown v. Crowley*, 312 F.3d 782, 787 (6th Cir. 2002).  The Sixth Circuit in *Brown* cited with approval *Walsh v. Mellas*, 837 F.2d 789, 799 (7th Cir. 1988), for the proposition that "even if a defendant has 'raised' the affirmative defense in a responsive pleading, 'the defense of qualified immunity may be deemed as waived if not properly and timely presented before the district court.'" *Brown*, 312 F.3d at 788 (quoting *Walsh*, 837 F.2d at 799).

ECF No. 58. That relief was granted, and Holsapple was given until December 20, 2013, to file a supplemental brief. Holsapple did not file the brief, however, until December 23, 2013; the Defendants then filed an objection to its consideration. *See* Defs.' Obj., ECF No. 66. Because Holsapple's supplemental brief was not timely, it was not considered for purposes of the Defendants' motion for summary judgment.

IV

Accordingly, it is **ORDERED** that the Defendants' motion for summary judgment, ECF No. 22, is **GRANTED** in part and **DENIED** in part.

It is further **ORDERED** that Holsapple's claims against Defendant Bay County are **DISMISSED**.

Dated: February 10, 2014                                       s/Thomas L. Ludington
                                                               THOMAS L. LUDINGTON
                                                               United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 10, 2014.
                              s/Tracy A. Jacobs
                              TRACY A. JACOBS